1
2
3
4

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

5
6
7

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 2:13-cr-00149-KJD-CWH |
| vs. | ) | **FINDINGS AND** |
| DERRICK YOUNG, *et al.*, | ) | **RECOMMENDATION** |
| Defendants. | ) | |

This matter is before the Court on Defendant Derrick Young's ("Defendant Young") Motion to Suppress (#25), filed on September 9, 2013, the Government's Response (#27), filed on September 23, 2013, and Defendant Young's Reply (#29), filed on September 30, 2013.  This matter is also before the Court on Defendant Thomas Lewis' ("Defendant Lewis") Motion to Suppress (#26), filed on September 9, 2013, and the Government's Response (#28), filed on September 23, 2013.  The Court conducted an evidentiary hearing over two days - October 21, 2013 and October 22, 2013.

On December 11, 2013, the Court issued an order reopening the evidentiary hearing for the limited purpose of determining what evidence was obtained after Defendant Lewis' detention and how the evidence was obtained.  *See* Order #38.  On January 7, 2014, counsel for Defendant Lewis and the Government contacted the chambers of the undersigned to represent that no additional evidence needed to be presented.  Accordingly, the Court issued an order vacating the additional hearing and ordering a stipulation, or supplemental memorandums, regarding two issues to be filed by January 14, 2014.  *See* Order #39.  On January 14, 2014, Defendant Lewis submitted a Memorandum (#40) regarding one issue and a Stipulation (#41), along with the Government, regarding the second issue.  Accordingly, the evidentiary hearing was closed and the supplemental briefs were considered.

**BACKGROUND**

On May 14, 2013, a Federal Grand Jury returned a three-count superseding indictment charging Derrick Young, Thomas Lewis, and Rodriguez Madden with Conspiracy to Commit Armed Bank Robbery in violation of 18 U.S.C. § 371, 2113(a) and (d) ("Count One"), Armed Bank Robbery in violation of 18 U.S.C. §§ 2113(a),(d) and 2 ("Count Two"), and Use of a Weapon in Furtherance of a Crime of Violence in violation of a 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii) and 2 ("Count Three") ("Superseding Indictment"), as well as a forfeiture allegation. *See* Superseding Indictment (#9). On September 9, 2013, Defendants Young and Lewis filed two separate motions to suppress. They allege different violations involving a related set of events.

**I.    The Bank Robbery**

On April 13, 2013, at approximately 12:53 p.m., two masked men wearing dark clothing entered a Bank of America located at 2445 East Centennial Parkway in North Las Vegas, Nevada. The suspects, allegedly armed with handguns, jumped the counter and demanded money. After receiving the money, the two suspects fled in a gray Chevrolet Impala along with a third suspect. Jacob Meyer ("Officer Meyer"), an off-duty Las Vegas Metropolitan Police Department officer, saw the suspects flee the bank in masks. Suspecting that a robbery had occurred, Officer Meyer followed the Chevrolet Impala, called 911 and began communicating the progress of his pursuit. *See* Govt. Exh. 2. After traveling for a few minutes, Officer Meyer observed the suspects abandon the Chevrolet Impala, ditch some clothing and other items, and continue their flight in a Dodge Charger.[1] He followed the Dodge Charger and continued his 911 communications. The suspects were identified only as black male adults.

North Las Vegas Police Department Officer Teodoro Mendez ("Officer Mendez"), who has been a patrol officer for ten years, testified that he responded to a report of a bank robbery in his marked patrol vehicle. Guided by LVMPD's dispatch communications, he drove to the general location where Officer Meyer reported that he was driving behind the Dodge Charger. *See* Govt.

---

[1] Officer Meyer later returned to the location where the Chevrolet Impala to secure the abandoned clothing and other items he believed to be relevant to the investigation.

1   Exh. 1.  Officer Meyer identified the Dodge Charger and Officer Mendez continued the chase.

2   Officer Mendez testified that he followed the Dodge Charger, with lights and sirens, on a high

3   speed chase until it was abandoned in the front yard of a home in a cul-de-sac at Labrusco Vine and

4   Capistrano Hills Street.  Officer Mendez testified that the Dodge Charger was not in a parking spot,

5   but in the landscape of the front yard.  He estimated that he arrived about 30 seconds after the

6   Dodge Charger had been abandoned and observed its engine still running with at least one door

7   open.  Officer Mendez stopped his patrol vehicle about two houses away from the abandoned

8   Dodge Charger and reported its location.  He did not see the occupants of the vehicle.

9            **A.**      **Detention of Defendant Lewis**

10         Officer Mendez testified that as he waited for other police to arrive, he had his service pistol

11   drawn, and the lights on his patrol car illuminated.  His vehicle siren stopped when he parked.

12   Officer Mendez estimated that about 15 to 20 individuals, presumably residents, gathered at the

13   scene and were watching him.  Meanwhile, North Las Vegas Police Department Officer Jeffrey

14   Pollard ("Officer Pollard") and his partner Officer Brian Wright ("Officer Wright") arrived in a

15   marked patrol car wearing their standard police uniforms.  Around that time, Officer Mendez

16   noticed a black male adult wearing a white t-shirt about two houses away from his position on

17   Capistrano Hills Street.  This black male adult was later identified as Defendant Lewis.  Unlike the

18   other people who were coming toward the scene, Officer Mendez observed Defendant Lewis

19   walking quickly away from the scene, until slowing down to light a cigarette, and continuing to

20   walk away more slowly.  Officer Mendez testified that he thought it odd that Defendant Lewis was

21   walking away and appeared "too calm."  Accordingly, Officer Mendez called by radio for Officers

22   Pollard and Wright to "stop that guy with the white shirt" referring to Defendant Lewis and gave a

23   command to "pull them all down" to another officer regarding a different suspect.

24         Officer Pollard drew his weapon and ordered Defendant Lewis to the ground.  Defendant

25   Lewis took another puff from his cigarette, threw it down, and lay on the ground.  Officer Pollard

26   testified that he drew his weapon and Officer Wright assisted in using handcuffs to detain Lewis.

27   Officer Pollard explained that he was concerned for officer safety because he was investigating an

28   armed bank robbery and Defendant Lewis' loose clothing could have hidden a weapon.  Defendant

1   Lewis provided only the name "Lewis" upon being asked, but a few minutes later provided his first

2   name, date of birth, and social security number.  Officer Pollard testified that Defendant Lewis was

3   cooperative and asked why he was being stopped.  After his detention, Defendant Lewis was

4   moved about 75 feet closer to Officer Mendez and joined by two other detained suspects,

5   Defendant Young and James Arthur Hill, Jr. for possible identification by Officer Meyer.[2]

6   **B.    Detention of Defendant Young**

7   Around the time that Officers Pollard and Wright detained Defendant Lewis, North Las

8   Vegas Police Department Officers Selwyn Talley ("Officer Talley") and Leonard Miller ("Officer

9   Miller") arrived at Bella Legato Avenue, approximately a block east of the abandoned Dodge

10  Charger.  Several citizens reported to dispatch that three black males were running through the

11  neighborhood.  Other than being black male adults, the officers did not have any other identifying

12  information regarding the suspects.  The officers did not have a description of the kind of clothing

13  that the suspects were wearing after ditching the clothing worn at the bank robbery.[3]  Immediately

14  after arriving, Officers Talley and Miller momentarily detained a man wearing a red shirt.  They

15  learned that he was the person who reported to police that he had seen a black male adult in the

16  neighborhood.  This man was still on the telephone with dispatch when detained.  Officer Miller

17  testified that this man observed a black male adult wearing a white t-shirt walking east on Bella

18  Legato Avenue.  Officer Miller further testified that the man did not describe any other items of

19  clothing, complexion, or age.  Officers Talley and Miller drove their patrol car east on Bella Legato

20  Avenue and within two minutes, they saw a black male adult wearing a white t-shirt walking at a

21  quick pace.  The suspect was headed diagonally in a southwest direction across the 5400 block of

22  Walnut, which is approximately half a mile from where the Dodge Charger was abandoned.

23  _____

24  [2] Officer Wright testified that he assisted in the arrest of James Arthur Hill, Jr. who was released
from custody and has not been charged in this case.

25

26  [3] Officer Meyer reported to dispatch that one suspect was wearing a grey hoodie.  He also
reported that a suspect had thrown a black shirt in the bushes and another had a black mask, which

27  also presumably thrown away.  It is not clear that this information was transmitted to the officers on the
scene.  Based on the 911 audio recording, Officer Meyers did not speak with the officers on the scene

28  until after Defendant Young was detained.  *See* Govt. Exh. 2.

Officer Miller testified that the suspect was jaywalking, sweating profusely, clammy, and avoiding eye contact. This suspect was later identified as Defendant Young.

Upon approaching Defendant Young, Officer Talley drew his weapon and ordered him to the ground. Officer Miller testified that a weapon was drawn because they were investigating an armed robbery and because Defendant Young's clothing was baggy, it was not possible to see if he had a weapon. Officer Talley testified that Defendant Young complied with the Officers' commands. Defendant Young was placed in handcuffs and searched. No weapons were found in the search. Defendant Young was asked for identification and he provided his name, date of birth, and social security number. Officer Miller testified that Defendant Young made no statements besides providing this identifying information. Officer Miller observed a scrape mark on one of Defendant Young's shins, which he believed might have been sustained while climbing the cinder block walls found in the neighborhood. Also present were uniformed North Las Vegas Police Department Officers Aires and Slocum, who were in the vicinity to assist with the investigation. The officers ran a records check that revealed an outstanding warrant out of Las Vegas Municipal Court for a citation for Driving without a Driver's License and a warrant out of Las Vegas Justice Court for Financial Responsibility. Defendant Young was informed that he was being placed under arrest pursuant to those warrants. Defendant Young was later moved to a location near the abandoned Dodge Charger for a show-up by Officer Meyer.

### C.    Show-Up by Officer Meyer

For Defendant Young, Officer Miller testified that he detained Defendant Young approximately half a mile from the abandoned Dodge Charger. After running a records check, Defendant Young was arrested and held at that location for 45 minutes to one hour. Officer Miller testified that Defendant Young was held in the back of his patrol car for that time, no statements were made, and he was then taken to the site of the show-up near the Dodge Charger. For Defendant Lewis, Officer Pollard testified that Defendant Lewis was moved about 75 feet from where he was detained and held with two other suspects for the show-up.

Officer Meyer testified that he was taken to the scene of the Dodge Charger approximately one hour after he observed the suspects run out of the bank. He testified that he did not have a

5

good view of the suspects' faces or physical features of their faces when he observed them run from the bank and followed in his vehicle. As a result, he was unable to make a 100% positive identification of Defendants Young and Lewis. However, Officer Meyer indicated that it was plausible that Defendants Young and Lewis were involved based on way they were taken into custody, time they were taken into custody, their size, and their clothing. For example, Officer Meyer testified that he saw one of the suspects wearing blue plaid shorts after exiting the Chevrolet Impala and observed him for about one minute from about fifty feet away in his vehicle. He was unable to confirm whether the suspect continued to wear the shorts upon entering the Dodge Charger, but he saw similar blue plaid shorts on Defendant Young at the show-up. Ultimately, Officer Meyer could not confirm that Defendant Young and Lewis were the men he saw flee the bank.

**II.    Transportation of Defendant Lewis**

On April 15, 2013 at about 8:30 a.m., two days after the bank robbery, Las Vegas Metropolitan Police Department Detective Eric Honea ("Detective Honea") transported Defendant Lewis from the Henderson Detention Center to the United States Marshal's holding facility at the Lloyd D. George Federal Courthouse. Detective Honea introduced himself and informed Defendant Lewis that he was going to transport him to court. Defendant Lewis was handcuffed and sat in the front passenger seat of an unmarked sedan for transport. Detective Honea, an officer with 13 years of experience, testified that he was selected for this duty because he was available at the time. He also testified that he knew Defendant Lewis had invoked his *Miranda* rights and would not be asking any questions regarding the crime. Detective Honea did not remind Defendant Lewis that he had invoked his *Miranda* rights nor did he read Defendant Lewis his *Miranda* rights.

While en route, Defendant Lewis told Detective Honea that he was selected to transport Defendant Lewis because the other officers were not happy with him for invoking his right to remain silent. Detective Honea replied that he did not hold it against him and it had no bearing on what he thought of Defendant Lewis as a person. Also, Detective Honea testified that Defendant Lewis made spontaneous statements to the effect that he really messed up this time and his kids were not going to understand. Detective Honea testified that he intended to be pleasant and make

6

1    casual conversation by asking Defendant Lewis how many kids he had.  Defendant Lewis said he

2    had eleven kids, kept his kids out of gangs, and had a daughter who would not be happy about this.

3    Detective Honea said words to the effect that we all make choices that we have to live with.

4    Defendant Lewis reportedly agreed, but said he made a bad one, a real bad one.  Detective Honea

5    recorded Defendant Lewis' statements immediately after transport was completed.  Defendant

6    Lewis testified that he never said that he messed up, his kids were not going to understand, or any

7    words to that effect.  He also testified that he discussed the military and told Detective Honea that

8    his daughter would be upset because he would miss her college graduation ceremony, which was

9    scheduled for April 29, 2013 in San Diego.  Detective Honea did not recall any comments about the

10   military or graduation.

11   **III.**　　**Defendants' Motions to Suppress**

12       Defendant Young's Motion to Suppress (#25) seeks suppression of all physical evidence,

13   testimonial evidence, and statements he made after being arrested that were obtained in violation of

14   the Fourth Amendment.[4]  He contends that aggressive methods were used to completely restrict his

15   liberty such as the number of officers and display of weapons.  As such, Defendant Young argues

16   that he was not detained, but rather, was arrested without probable cause based on a lack of

17   specificity in the description of the bank robbery suspects.

18       In response, the Government argues that Defendant Young's detention is supported by

19   reasonable suspicion based on his location, physical appearance, and behavior.  In addition, the

20   Government asserts that any statements made after his arrest should not be suppressed because he

21   was arrested pursuant to outstanding warrants that are unrelated to this case.  Further, the

22   Government argues that the display of weapons, use of handcuffs, and number of officers do not

23   convert an investigatory stop into an arrest given the officers' fear for personal and public safety.

24       In his Motion to Suppress (#26), Defendant Lewis requests that all physical evidence and

25

26

27      [4] Defendant Young does not detail exactly what physical evidence, testimonial evidence, and statements are at issue in the instant motion.  At the October 21, 2013 hearing, Defendant Young's Counsel generally stated that the motion seeks suppression of the show-up results and Young's

28   statements made on April 13, 2013.

statements he made on April 13, 2013 be suppressed because they were collected in violation of the Fourth Amendment.[5]  He alleges that the aggressiveness of the police and restriction of his liberty resulted in an unlawful arrest rather than investigatory stop.  In addition, Defendant Lewis seeks suppression of his statements to Detective Honea on April 15, 2013 because they were made in violation of the Fifth and Sixth Amendments.  Defendant Lewis contends that he previously invoked his *Miranda* rights to remain silent and to have an attorney.  Finally, Defendant Lewis argues that his April 15, 2013 statements should be suppressed as a derivative of the prolonged unlawful detention on April 13, 2013.

In response, the Government contends that Defendant Lewis' detention is supported by reasonable suspicion based on his physical characteristics, clothing, and proximity to the abandoned Dodge Charger.  Further, the Government asserts that Officer Meyer's identification of Defendant Lewis as a suspect provided probable cause to arrest him.  Finally, the Government contends that Defendant Lewis was not subjected to custodial interrogation, but rather, Detective Honea engaged in causal conversation not designed to elicit incriminating statements.

At the evidentiary hearing on October 21, 2013, the Court heard testimony from Officer Miller, Officer Talley, Officer Mendez, Officer Pollard, Officer Wright, and Officer Meyer.  In addition, Defendant Young presented Exhibit A, a map with a red dot pinpointing where the Dodge Charger was found, and Exhibit B, a photo of James Arthur Hill, Jr.  The Court admitted both Exhibits and Defendant Young presented no other exhibits to be admitted.  Further, the Government obtained admission of Exhibits 1, 2, 3a, 3b, 3c, 4, and 5.  Exhibit 1 is a recording of

---

[5] Defendant Lewis does not specify what physical evidence and statements he seeks to suppress besides identifying the statements made on April 15, 2013 to Detective Honea.  The Court requested clarification of the evidence at issue on October 21, 2013 and again on January 7, 2014 when it ordered Defendant Lewis to "[s]pecify any and all evidence Defendant Lewis is seeking to suppress in Motion #26 along with when and how it was collected."  Defendant Lewis' Memorandum (#40) merely states that he seeks to suppress the identification by Officer Meyer, the fact that he was transported to court, and "any/all statement(s) Mr. Lewis made after his arrest, including, but not limited to, those statements he allegedly made to . . . [D]etective Honea."  Accordingly, despite the Court's Order #39, Defendant Lewis has failed to identify any evidence besides the show-up results and statements made on April 15, 2013 to Detective Honea.  Further, Defendant Lewis presented no evidence that he made any other statements on April 13, 2013 or otherwise.

radio traffic from the North Las Vegas Police Department and Exhibit 2 is a recording of communications between Officer Meyer and 911. The Court notes that it is very difficult to hear what is being said on the recordings and many parts are inaudible. No transcript of the recordings was provided to the Court. Additionally, Exhibits 3a, 3b, and 3c are maps of the locations at issue in these motions and Exhibits 4 and 5 are photos of Defendants Young and Lewis, respectively. No other exhibits were sought to be admitted by the Government. At the evidentiary hearing on October 22, 2013, the Court heard testimony from Detective Honea and Defendant Lewis. No exhibits were introduced or admitted.

On December 11, 2013, the Court issued an order reopening the evidentiary hearing for the limited purpose of determining what evidence was obtained after Defendant Lewis' detention and how the evidence was obtained. *See* Order #38. On January 7, 2014, counsel for Defendant Lewis and the Government advised the Court that no additional evidence needed to be presented. On January 7, 2014, the Court issued an order vacating the additional hearing and ordering clarification of two issues - (1) specify any and all evidence Defendant Lewis is seeking to suppress in Motion #26 along with when and how it was collected and (2) specify when and how Defendant Lewis' *Miranda* rights were administered and invoked. *See* Order #39. On January 14, 2014, Defendant Lewis submitted a Memorandum (#40) regarding issue one and a Stipulation (#41), along with the Government, on issue two. As noted above, Defendant Lewis' Memorandum (#40) failed to specify what evidence he is seeking to suppress with any detail. The Stipulation (#41) provided two other facts. First, Defendant Lewis was verbally advised of his *Miranda* rights on April 13, 2013 following the show-up and he invoked those rights immediately. Second, Defendant Lewis made no statements on April 13, 2013. Accordingly, the Court has considered only the testimony presented at the evidentiary hearing, admitted exhibits, and two supplemental facts in its analysis.

## DISCUSSION

### I.    Fourth Amendment

The Fourth Amendment addresses "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. In doing so, the Fourth Amendment protects a person's reasonable and legitimate expectations of

9

1    privacy. *Katz v. United States*, 389 U.S. 347 (1967). More specifically, it protects "people not

2    places." *Id*. As a result, evidence obtained in violation of the Fourth Amendment and evidence

3    derived from it may be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371

4    U.S. 471 (1963).

5           The protections of the Fourth Amendment extend to brief investigatory stops of persons that

6    are not formal arrests. *Terry v. Ohio*, 392 U.S. 1, 9-10 (1968). For Fourth Amendment purposes, a

7    seizure occurs "when the officer, by means of physical force or show of authority, has in some way

8    restrained the liberty of a citizen." *Terry*, 392 U.S. at 19, n.16. In *United States v. Mendenhall*,

9    446 U.S. 544 (1980), the United States Supreme Court developed what the courts have referred to

10   as the *Mendenhall* test for determining when a seizure occurs. "A person has been 'seized' within

11   the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the

12   incident, a reasonable person would have believed that he was not free to leave." *Id*. at 554.

13          Here, Officer Talley drew his gun and ordered Defendant Young to stop, get on the ground,

14   and handcuffed him. Similarly, Officer Pollard drew his gun and ordered Defendant Lewis to stop,

15   get on the ground, and handcuffed him. Considering these circumstances and applying the

16   *Mendenhall* test, the Court finds that Defendants Young and Lewis were seized for the purposes of

17   the Fourth Amendment because a reasonable person would not have believed that he was free to

18   leave.

19          **A.    Investigatory Detention**

20          Police do not run afoul of the Fourth Amendment every time they stop an individual. The

21   Supreme Court has long held that police may stop a citizen at any time, ask for identification and

22   other information, and even request permission to search so long as a reasonable person in the

23   citizen's position would recognize that he or she is free to leave or terminate the encounter. *See*

24   *generally, Terry*, 392 U.S. 1; *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469

25   U.S. 1 (1984). Indeed, police officers can approach individuals as to whom they have no

26   reasonable suspicion and ask them potentially incriminating questions because "mere police

27   questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

28          Moreover, under *Terry*, an officer may conduct a brief, investigatory stop if there is

10

1   reasonable, articulable suspicion that criminal activity is afoot.  *Terry*, 392 U.S. at 30.  Reasonable

2   suspicion is a less demanding standard than probable cause and requires a showing considerably

3   less than preponderance of the evidence.  However, it requires at least a minimal level of objective

4   justification for making the stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  The officer must

5   be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal

6   activity.  *Terry*, supra, at 27.

7          In assessing whether an officer has reasonable suspicion to conduct a *Terry* stop, courts

8   look at the "totality of the circumstances" to see whether the detaining officer had a "particularized

9   and objective basis" for suspecting legal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273

10  (2002).  "An investigatory stop must be justified by some objective manifestation that the person

11  stopped is or is about to be engaged in criminal activity."  *United States v. Cortez*, 449 U.S. 411,

12  417 (1981); *see also United States v. Sigmond-Ballasteros*, 285 F.3d 1117, 1121 (9th Cir. 2002)

13  (citing *Arvizu*, 534 U.S. at 273).  A reviewing court's determination of reasonable suspicion is a

14  process that "allows officers to draw on their own experience and specialized training to make

15  inferences from and deductions about the cumulative information available to them that 'might

16  well elude an untrained person.'"  *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418).  The

17  Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe

18  that criminal activity may be afoot and observation of factors which are by themselves consistent

19  with innocence, but may collectively amount to reasonable suspicion.  *Id*. at 273-74.  Reasonable

20  suspicion is not a matter of hard certainties, but of probabilities.  *Cortez*, 449 U.S. at 417-18.

21         Defendants Young and Lewis allege that their detentions were tantamount to warrantless

22  arrests that were made without probable cause and therefore, violated their Fourth Amendment

23  rights.  The Government contends that Defendants Young and Lewis were lawfully detained based

24  on factors that constitute reasonable suspicion.  Furthermore, the Government argues that the use of

25  force, handcuffing, and number of officers involved in the detentions was justified to protect the

26  officers' and public's safety.

27         With respect to Defendant Young, the Court finds that Officers Talley and Miller were

28  justified in detaining him as part of the investigation.  The officers had just received information

11

1  from a man in a red shirt who had been communicating with dispatch that a black male adult in a

2  white t-shirt had walked away from the area where the Dodge Charger was abandoned.  Within two

3  minutes and approximately half a mile away, the officers saw Defendant Young.  Defendant Young

4  is black male adult who was wearing a white t-shirt and walking quickly away from the location of

5  the Dodge Charger.  When Officer Miller caught up with Defendant Young, he observed him

6  sweating profusely and avoiding eye contact.  Under the totality of the circumstances, the Court

7  finds that reasonable suspicion exists for the detention.  Although a close call, the Court finds the

8  following collective factors support finding reasonable suspicion: Defendant Young's geographic

9  proximity to the Dodge Charger, close proximity in time relative to the armed robbery, physical

10  characteristics of black, male, adult, behavior upon being approached by police by sweating and

11  avoiding eye contact, confirmation of a tip that he was wearing a white t-shirt, and direction

12  walking at a fast pace.  Defendant Lewis contends that the limited physical characteristics of black,

13  male, adult, a white t-shirt, and sweating are insufficient articulable facts to constitute reasonable

14  suspicion.  However, the additional factors of geographic and time proximity, direction walking,

15  fast pace, and behavior upon being approached by police are sufficient articulable facts to constitute

16  reasonable suspicion for the stop.  Therefore, the Court finds that the initial detention of Defendant

17  Young did not violate the Fourth Amendment.

18       For Defendant Lewis, the Court finds that Officer Mendez was justified to direct Officers

19  Pollard and Wright to detain Defendant Lewis based on reasonable suspicion that he was involved

20  in the bank robbery.  Officer Mendez was 30 seconds behind the Dodge Charger when it was

21  abandoned.  He arrived with his sirens and lights activated, had his weapon drawn, and reasonably

22  believed that the black male suspects were in the immediate area.  Officer Mendez observed

23  bystanders gathering and moving closer to the abandoned Dodge Charger.  Therefore, Officer

24  Mendez thought it suspicious that Defendant Lewis, who is a black male adult, was two houses

25  away and walking away at a quick pace when all other individuals at the scene were looking at

26  Officer Mendez and coming closer to the scene.  Based on his ten year experience, Officer Mendez

27  believed the combination of temporal and geographic proximity, physical characteristics, and

28  behavior in walking away at a quick pace justified a stop based on reasonable suspicion.  Although

1   a close call, the Court finds that under the totality of the circumstances, Defendant Lewis was

2   detained based on reasonable suspicion.  Defendant Lewis argues that there may have been many

3   black, male, adults in that area so the officer lacked particularized suspicion.  However, the Court

4   finds that the additional factors of temporal and geographic proximity, Officer Mendez' experience

5   regarding suspicious activity around a crime scene, and direction walking at a fast pace are

6   sufficient to constitute reasonable suspicion.  Therefore, the Court finds that the initial detention of

7   Defendant Lewis did not violate the Fourth Amendment.

8           There are many innocent reasons why a person might walk away from a scene such as, he

9   has no interest or has another engagement.  *Terry* contemplates the resolution of such ambiguities

10  during a stop.  For example, the Supreme Court explained:

11          In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and
            in an appropriate manner approach a person for purposes of investigating possibly
12          criminal behavior even though there is no probable cause to make an arrest.'  The Fourth
            Amendment does not require a policeman who lacks the precise level of information
13          necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to
            occur or a criminal to escape.  On the contrary, *Terry* recognizes that it may be the
14          essence of good police work to adopt an intermediate response.  A brief stop of a
            suspicious individual, in order to determine his identity or to maintain the status quo
15          momentarily while obtaining more information, may be most reasonable in light of the
            facts known to the officer at the time.

16  *Adams v. Williams*, 407 U.S. 143, 145-46 (1972) (citations omitted).  Accordingly, a valid stop can

17  include the momentary restriction of a person's freedom of movement in order to maintain the

18  status quo while making an initial inquiry.  *See United States v. Patterson*, 648 F.2d 625, 633 (9th

19  Cir. 1988).  In cases where "the conduct justifying the stop was ambiguous and susceptible of an

20  innocent explanation . . . *Terry* recognized that the officers could detain the individuals to resolve

21  the ambiguity." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  Also, "[c]onduct innocent in the

22  eyes of the untrained may carry entirely different 'messages' to the experienced or trained

23  observed." *United States v. Bernard*, 623 F.2d 551, 560 (9th Cir. 1979) (citation omitted).

24          Here, the officers were utilizing the description from dispatch of three black male adults

25  suspected of an armed robbery in addition to searching close in time and proximity to the

26  abandoned Dodge Charger after a high speed chase.  The Court finds it reasonable for the officers

27  to rely on their experience and training to detain Defendants Young and Lewis when they observed

28

1   them walking away from an area close to the abandoned Dodge Charger in a suspicious manner.

2   Therefore, the Court finds that the detentions of Defendants Young and Lewis were justified to

3   allow for further investigation into the armed robbery.

4               **B.**     **Use of Force During Detention**

5         Both Defendants Young and Lewis argue that their detentions were de facto arrests based

6   on the aggressiveness of the police methods and complete restriction of liberty. Defendants Young

7   and Lewis highlight the fact that they were detained at gunpoint, ordered to the ground, handcuffed,

8   and numerous officers were present at the scene of the detentions. Consequently, Defendants

9   Young and Lewis contend that there was no probable cause to support their immediate arrest upon

10   being approached by officers. In response, the Government argues that Defendants Young and

11   Lewis were subjected to investigatory detentions. The Government claims that investigatory

12   detentions are not automatically converted into arrests merely because a weapon is used, the

13   suspect is ordered to lie on the ground, handcuffed, and placed in a police vehicle for questioning.

14   Further, the Government alleges that the officers displayed their weapons and handcuffed

15   Defendants Young and Lewis because they justifiably feared for personal and public safety.

16         There is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an

17   investigative stop." *Royer*, 460 U.S. at 506; *see also United States v. Sharpe*, 470 U.S. 675, 685

18   (1985). In determining whether an investigative detention has ripened into an arrest, the court

19   considers the "totality of the circumstances." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir.

20   1988) (cert. denied 490 U.S. 1040 (1989)); *see also United States v. Del Vizo*, 918 F.2d 821, 824

21   (9th Cir. 1990). When assessing the circumstances, the Court considers whether "the investigative

22   methods employed . . . [are] the least intrusive means reasonably available to verify or dispel the

23   officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500.

24         The Supreme Court has permitted limited intrusions of a suspect's liberty during a *Terry*

25   stop to protect officer safety. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (finding a

26   police officer may take reasonable measures to neutralize the risk of physical harm and determine

27   whether the person in question is armed). In addition, the Ninth Circuit has held that an

28   investigative stop is not transformed into an arrest merely because the police use force in handling

the suspect.  *See, e.g., United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (suspects

not arrested when ordered to get out of their car and lie down on pavement); *United States v.*

*Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir. 1983) (per curiam) (same); *United States v. Beck*, 598

F.2d 497, 501 (9th Cir. 1979) (finding the use of force does not convert a stop to an arrest "if it

occurs under circumstances justifying fears for personal safety.").  Further, the Ninth Circuit has

clarified that a *Terry* stop is not transformed into a de facto arrest when a defendant is moved from

the street to the back of a police car.  *See United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.

1988).  Overall, the case law supports the proposition that police officers are entitled to employ

reasonable methods to protect themselves and others in potentially dangerous situations.  *See Allen*

*v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995).  Furthermore, the Ninth Circuit has

summarized examples of when such force is acceptable:

> Despite the absence of a bright-line rule, our cases make clear that we have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;  2) where the police have information that the suspect is currently armed;  3) where the stop closely follows a violent crime;  and 4) where the police have information that a crime that may involve violence is about to occur.  Clearly, some combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest.

*Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996).

When Defendant Young was detained, the officers had their weapons drawn and ordered

him to the ground until handcuffed.  Officers Miller and Talley knew that an armed bank robbery

and high speed chase to evade the police had just occurred.  Additionally, Officers Aires and

Slocum were patrolling the immediate area where the Dodge Charger was abandoned to assist in

the investigation.  Officer Miller testified that his weapon was drawn because he was investigating

an armed robbery and because Defendant Young's clothing was baggy, it was not possible to see if

he had a weapon.  Similarly, when Defendant Lewis was detained, the Officer Pollard had his

weapon drawn and ordered him to the ground until handcuffed with assistance from Officer

Wright.  Officer Pollard was assisting Officer Mendez in freezing the scene around the abandoned

Dodge Charger and investigating suspects that Officer Mendez pointed out.  In both detentions, the

officers confronted suspects as part of their investigation into an armed robbery and high speed

15

1   chase. They were faced with suspects who were wearing loose-fitting clothing that might conceal

2   weapons. Therefore, the officers were justified in drawing their weapons, using handcuffs, and

3   including several officers in the detentions based on concern for personal and public safety. *See,*

4   *e.g., Lambert*, 98 F.3d at 1189; *City of Los Angeles*, 66 F.3d at 1057. Under the totality of the

5   circumstances, the utilization of weapons, handcuffs, and several officers to effectuate the

6   detentions of Defendants Young and Lewis did not "ripen" them into arrests. *Baron*, 860 F.2d at

7   914. In conclusion, the Court finds that there was reasonable suspicion to detain Defendants

8   Young and Lewis, the use of force did not ripen the detentions into immediate arrests, and it is not

9   necessary to suppress any evidence as a result of the initial detentions.

10          **C.    Arrest of Defendant Young**

11          Although the Court finds that Defendant Young's initial detention did not ripen into an

12   arrest, he was arrested after a records check was performed. After being detained, the officers

13   conducted a records check that revealed outstanding warrants out of Las Vegas Municipal Court for

14   a citation for Driving without a Driver's License and Las Vegas Justice Court for Financial

15   Responsibility. Accordingly, Defendant Young was lawfully arrested pursuant to those warrants.

16   Consequently, the Court finds no basis to suppress the show-up results for Defendant Young or

17   statements made after April 13, 2013 as "fruit" of the poisonous tree. *Wong Sun*, 371 U.S. at 488.

18          Further, the Court finds that the passage of time from Defendant Young's initial detention

19   to his arrest does not violate the Fourth Amendment. Here, the Court finds it reasonable to detain

20   Defendant Young until a records check could be performed. In addition to the factors identified

21   above that were known by Officer Miller prior to stopping Defendant Young, Officer Miller

22   noticed a scrape on Defendant Young's shin when the frisk was performed. Accordingly, the

23   officers had reasonable suspicion to temporarily detain Defendant Young to further investigate

24   him.[6] Officers Miller and Talley testified that they performed a records search quickly after

25

26          _____

27          [6] The Court finds reasonable suspicion exists for the initial detention of Defendant Young and
     how the detention was executed did not ripen it into an arrest. *Arguendo*, even if Defendant Young was
28   immediately arrested upon the officers' approach, there is no evidence to suppress. He identified no
     statements or tangible evidence seized between the officers' approach and his eventual arrest for the

16

1   obtaining identifying information from Defendant Young.  Therefore, the Court will recommend

2   that Defendant Young's motion to suppress be denied.

3        **D.**     **Arrest of Defendant Lewis**

4        A warrantless arrest of an individual in a public place for a felony, or a misdemeanor

5   committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is

6   supported by probable cause.  *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also*, *Atwater v.*

7   *Lago Vista*, 532 US 318, 354 (2001) ("If an officer has probable cause to believe that an individual

8   has committed even a very minor criminal offense in his presence, he may, without violating the

9   Fourth Amendment, arrest the offender.").  "Probable cause exists when, under the totality of the

10  circumstances known to the arresting officers, a prudent person would have concluded that there

11  was a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179

12  F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted).  Absent probable

13  cause, a warrantless arrest is illegal.  *Id.*

14       Police officers may rely on the totality of facts available to them when determining whether

15  probable cause exists to make an arrest.  *See United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir.

16  1989) (officers' experience and expertise); *Illinois*, 528 U.S. 119, (nature of the area); *United States*

17  *v. Koshnevis*, 979 F.2d 691, 695 (9th Cir. 1992) (suspect's contradicting himself and nervousness

18  were a part of the probable cause determination).  Notably, the probable cause standard is objective.

19  An officer's stated reason for exercising his discretion to arrest is immaterial if he has probable

20  cause to arrest the suspect for any criminal offense.  *See, e.g., Edgerly v. City and County of San*

21  *Francisco*, 599 F.3d 946, 954 (9th Cir. 2010); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404-05

22  (2006).

23       As previously discussed, the Court finds that, although a close call, there was reasonable

24  suspicion to detain Defendant Lewis for further investigation.  Officer Mendez, who has ten years

25  of experience as a police officer, ordered Defendant Lewis to be detained based on his physical and

26  

27  outstanding warrants.  Further, the lawful arrest pursuant to the outstanding warrants is an intervening
    event that would purge the taint of an illegal arrest and prevent the suppression of the show-up results

28  and subsequent statements.

1   temporal proximity to the abandoned Dodge Charger, being a black male adult, and his behavior

2   that was inconsistent with other bystanders at the scene in walking away at a fast pace. After being

3   detained, Defendant Lewis was asked to identify himself and he only supplied his last name, Lewis.

4   Later, Defendant Lewis provided his full name, date of birth, and social security, but no other

5   information.

6        It is unclear exactly how much time passed between Defendant Lewis' initial detention and

7   his arrest after the show-up. However, Officer Meyer testified that he arrived to do the show-up

8   about one hour after observing the suspects exit the bank. As with Defendant Young, the Court

9   finds this was a reasonable period of time to allow the police to diligently pursue their investigation

10  of the armed robbery. No evidence was presented as to what questions, if any, were asked of

11  Defendant Lewis during this time period. Also, no evidence was presented regarding what

12  investigative steps were taken to determine whether Defendant Lewis was involved in the armed

13  robbery. The only other step in the investigation, after Defendant Lewis' initial detention, that the

14  Government presented is Officer Meyer's show-up. Officer Meyer testified that he was unable to

15  100% positively identify Defendant Lewis as being one of the suspects he observed run from the

16  bank; he did not specify that he recognized Defendant Lewis' clothing or any other physical

17  characteristics. Therefore, the Government failed to carry its burden of presenting any additional

18  evidence that was obtained subsequent to Defendant Lewis' initial detention to meet the higher

19  standard of probable cause for an arrest. Accordingly, the Court finds that there was not probable

20  cause to arrest Defendant Lewis subsequent to the show-up.

21       Although Defendant Lewis seeks suppression of the show-up results, the Court finds this to

22  be unwarranted. The show-up was the last step in the investigation of Defendant Lewis prior to his

23  unlawful arrest. The officers had reasonable suspicion to justify the stop and resolve ambiguity as

24  to whether Defendant Lewis was involved in the armed robbery under investigation. *See Illinois*,

25  528 U.S. at 125. In order to do so, Defendant Lewis was detained until two other suspects could be

26  gathered in the same location and Officer Meyer could be transported to perform the show-up.

27  Officer Meyer had returned to the location of the Chevrolet Impala where he had observed clothing

28  and other items discarded. The Supreme Court has explained, "In assessing the effect of the length

18

1    of the detention, we take into account whether the police diligently pursue their investigation."

2    *United States v. Place*, 462 U.S. 696, 709; *see also Adams*, 407 U.S. 143.  Under the totality of the

3    circumstances, the passage of less than an hour does not transform the detention into an arrest.

4    Therefore, the Court finds that the show-up results are not "fruit" of the poisonous tree as the show-

5    up occurred prior to the illegality.  *Wong Sun*, 371 U.S. at 488.  Accordingly, the Court will

6    recommend that Defendant Lewis' motion to suppress be denied in part with respect to the show-up

7    results.

8    **II.     Fifth and Sixth Amendments**

9           The obligation to administer *Miranda* warnings attaches once a person is subject to a

10   "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).  Custody turns on

11   whether there is a formal arrest or a restraint on freedom of movement of the degree associated

12   with a formal arrest.  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks

13   omitted).  In addition to being in custody, the accused must also be subject to an interrogation.

14   *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  Not every question asked in a custodial setting

15   constitutes interrogation.  *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citing *United States v.*

16   *Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).  Interrogation means questioning or "its functional

17   equivalent," including "words or actions on the part of the police (other than those normally

18   attendant to arrest and custody) that the police should know are reasonably likely to elicit an

19   incriminating response from the suspect."  *Innis*, 446 U.S. 291 at 301.  An "incriminating response"

20   is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at

21   trial.  *Id.* at 302.  Whether the questioning constitutes an interrogation is an objective test that

22   focuses on the perception of the defendant; the officer's subjective intent in asking the questions is

23   relevant, but not determinative.  *See, e.g., United States v. LaPierre*, 998 F.2d 1460, fn.6 (9th Cir.

24   1993); *Innis*, 446 U.S. at 301-02; *Booth*, 669 F.2d at 1238 (finding the test to be an objective one

25   where the subjective intent of police is relevant, but not conclusive).  Accordingly, volunteered

26   statements are not barred by the Fifth Amendment.  *Miranda*, 384 U.S. at 478.

27          On April 15, 2013, Defendant Lewis was transported by Detective Honea from the

28   Henderson Detention Center to the United States Marshal's holding facility at the Lloyd D. George

19

Federal Courthouse.  Defendant Lewis contends that because he previously invoked his *Miranda* rights to remain silent and to have an attorney present during questioning, Detective Honea violated his Fifth and Sixth Amendment rights by asking him questions.  In response, the Government concedes that Defendant Lewis invoked his *Miranda* rights, but contends that the statements made during transport were voluntary rather than the product of a custodial interrogation or the functional equivalent of interrogation.  The Government alleges that Detective Honea made casual conversation regarding Defendant Lewis' kids that was initiated by Defendant Lewis and not designed to elicit an incriminating response.

The Court finds that Detective Honea engaged in casual conversation with Defendant Lewis that was not intended to elicit an incriminating response.  Detective Honea testified that he asked about Defendant Lewis' kids to be "pleasant."  Additionally, he testified that he told Defendant Lewis that he did not take it personally that Defendant Lewis invoked his right to an attorney and commented, "We all make choices; we just have to live with them."  The Court finds that these questions and comments are not related to the charged crime or reasonably likely to elicit an incriminating response.  *See Booth*, 669 F.2d at 1238 (degree to which questions are routine or involve matters unrelated to the crime are important factors); *see also Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) (citing *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation.")).  Rather, the Court characterizes the discussion as a casual conversation that is not the functional equivalent of interrogation.  *See United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) (superseded by statute on other grounds) ("Incriminating statements made in the course of casual conversation are not products of a custodial interrogation.").  Accordingly, the Court finds that Defendant Lewis' Fifth and Sixth Amendment rights were not violated.

### III.    Exclusionary Rule

Defendant Lewis also contends that the statements he made during the transport should be suppressed as fruit of the poisonous tree resulting from the prior unlawful arrest. Although the Court finds that Defendant Lewis' statements to Detective Honea should not be suppressed for violation of the Fifth and Sixth Amendments, the Court finds that they should be suppressed as

1    subsequently tainted evidence that is not sufficiently attenuated from the illegal arrest. *See Wong*

2    *Sun*, 371 U.S. at 488.  In order to prevent the suppression of evidence acquired following an illegal

3    arrest, the Government must establish that the defendant made incriminatory statements voluntarily

4    and there is a sufficient break between the defendant's illegal arrest and his subsequent statements.

5    *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).  The court's threshold determination of the

6    voluntariness of incriminatory statements is based on the totality of the circumstances. *Colorado v.*

7    *Connelly*, 479 U.S. 157, 176 (1986).  Specifically, the court must determine whether "the

8    government obtained the statement by physical or psychological coercion or by improper

9    inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th

10   Cir. 1990) (quoting *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  In

11   determining whether "the suspect's will was overborne," *id.*, the court considers the age and

12   intelligence of the defendant, whether advice on constitutional rights was provided, the length of

13   detention, whether questioning was repeated or prolonged and the use of physical punishment.

14   *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citations omitted).

15          Here, as discussed above, the Court finds that the Government has demonstrated that

16   Defendant Lewis' April 15, 2013 statements to Detective Honea were voluntary.  Detective Honea

17   testified that he was attempting to make casual conversation and knew Defendant Lewis had

18   invoked his *Miranda* rights.  There is no evidence of physical or psychological coercion.

19   Accordingly, the threshold voluntariness requirement is satisfied.

20          Even if a statement is voluntary under the Fifth Amendment, a determination of the

21   admissibility of evidence under the Fourth Amendment involves a separate inquiry. *Taylor v.*

22   *Alabama*, 457 U.S. 687, 690 (1982).  In *Brown*, the Supreme Court addressed the issue of whether

23   the issuance of *Miranda* warnings sufficiently attenuated the taint of an illegal arrest such that the

24   court was not required to suppress the defendant's incriminatory statements as the fruit of an illegal

25   arrest.  422 U.S. at 591–92 (citing *Wong Sun*, 371 U.S. 471).  In determining the admissibility of

26   such evidence, the Supreme Court considered four factors: (1) whether *Miranda* warnings were

27   issued; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening

28   circumstances; and (4) the purpose and flagrancy of the official misconduct. *See Brown*, 422 U.S.

21

1    at 603–04.  No single fact is dispositive and the burden of showing the admissibility of the

2    incriminatory statements rests on the Government.  *Id.*

3         With respect to the first factor of *Miranda* warnings, Defendant Lewis was verbally advised

4    of his *Miranda* rights.  However, the fact that Defendant Lewis was read his *Miranda* rights and

5    invoked those rights is not an intervening event that removes the taint of the illegal arrest.  *See*

6    *Brown*, 422 U.S. at 602-03 (finding *Miranda* warnings, alone and per se, cannot always break the

7    casual connection between the illegality and later statement); *see also Dunaway v. New York*, 442

8    U.S. 200, 216-217 (1979) (same).  Defendant Lewis was read his *Miranda* rights immediately after

9    the show-up and Detective Honea testified that he did not re-administer Defendant Lewis' *Miranda*

10   rights during transport.  Consequently, the Court finds that the first factor does not weigh against

11   suppression.

12        Regarding the second factor of temporal proximity, two days separate the illegal arrest and

13   the statements.  While two days may be a sufficient break in other circumstances, the Government

14   presented no evidence that any further investigation was conducted or any other evidence was

15   produced to establish probable cause.  *See United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011)

16   (finding 36 hours, although a relatively long time, does not weaken the causal connection).  In fact,

17   the Ninth Circuit has noted that there is no bright line test for temporal proximity in an attenuation

18   analysis and it must be considered in conjunction with the presence of intervening circumstances.

19   *Id.* at 1159.  Here, there is no indication that Defendant Lewis was being investigated for another

20   crime, would have been in custody for another reason, or was questioned between his illegal arrest

21   and statements to Detective Honea.  As a result, the passage of time did not dissipate the taint.  The

22   officers maintained control over Defendant Lewis for two days and no evidence was presented that

23   probable cause could have been found during those two days.  Accordingly, the Court finds the

24   temporal proximity factor does not weigh against suppression.

25        With respect to the third factor of intervening events, the Court finds that there is an

26   unbroken causal chain that links Defendant Lewis' illegal arrest and his subsequent statements.

27   Defendant Lewis' prolonged detention until April 15, 2013, without probable cause, does not

28   remove the taint of the illegal arrest.  The Government presented no evidence that any additional

evidence was obtained from the time that Defendant Lewis was arrested to his transport to federal court.[7]  Further, the Government presented no evidence of any other intervening event that could purge the taint of the illegal arrest from the subsequent statements such as, consulting with an attorney, additional *Miranda* warnings, other evidence to justify arrest, or application of the independent source doctrine.  *See Wong Sun*, 371 U.S. at 491 (finding the connection between the arrest and statement so attenuated as to dissipate the taint because the defendant was released on his own recognizance after a lawful arraignment and returned voluntarily several days later to make a statement); *see also United States v. Manuel*, 706 F.2d 908 (9th Cir. 1983) (finding even if the defendant's initial arrest was illegal, his confession the next day is admissible in light of overwhelming evidence gathered independently after his arrest).  Accordingly, the absence of any intervening circumstances weighs in favor of suppression.

As to the fourth factor of official misconduct, the Court considered the nature of Detective Honea's conversation and finds that his purpose was not to obtain incriminatory statements. Detective Honea was not present on April 13, 2013 or assigned to the investigation of Defendant Lewis.  Nevertheless, based on the lack of evidence presented, the Court finds the arrest of Defendant Lewis without probable cause to be a sufficiently flagrant violation of the Fourth Amendment to support suppression as the appropriate remedy in this situation.  *See United States v. Perez-Esparza*, 609 F.2d 1284 (9th Cir. 1979) (finding the purpose and flagrancy factor insufficient to overcome the lack of attenuation dictated by the other factors); *see also United States v. Ricardo D.*, 912 F.2d 337 (9th Cir. 1990) (same).  As previously discussed, the Court found it to be a close call to justify the detention based on reasonable suspicion.  The show-up results did not reasonably identify Defendant Lewis as someone Officer Meyer observed exiting the bank.  Accordingly, the arrest without probable cause is not a de minimus violation of the Fourth Amendment.  The Court

---

[7] Defendant Lewis cursorily requests the suppression of the fact that he was transported to federal court in his supplemental brief.  *See* Memorandum (#40).  The Court finds no authority that warrants the suppression of this fact nor did Defendant Lewis provide any points and authorities in support of this request as required by LCR 47-9.  Accordingly, the Court finds that the fact that Defendant Lewis was transported to federal court should not be suppressed.

finds that the Government failed to carry its burden of demonstrating that the taint of the illegal arrest on April 13, 2013 sufficiently dissipated by the time Defendant Lewis gave his subsequent statements. As a result, the Court will recommend that Defendant Lewis' motion to suppress be granted in part with respect to the April 15, 2013 statements he made to Detective Honea.

## CONCLUSION

Under the totality of the circumstances, the Court finds that reasonable suspicion exists for the detentions of Defendants Young and Lewis. The Court considered factors like temporal and geographic proximity to the abandoned Dodge Charger, physical description, and behavior upon being approached by officers. The Court finds neither the passage of time nor the use of force in performing the detentions transformed them into automatic arrests. Further, the Court finds probable cause exists for the eventual arrest of Defendant Young pursuant to outstanding warrants. Accordingly, the Court concludes that suppression of the show-up results and subsequent statements by Defendant Young is not warranted.

On the other hand, the Court finds that the Government failed to carry its burden of demonstrating that probable cause exists for the arrest of Defendant Lewis. The show-up results did not provide additional evidence to constitute probable cause for an arrest and the Government presented no other evidence resulting from the investigation of Defendant Lewis subsequent to his initial detention. Given that the Court finds that the show-up was part of the investigation while Defendant Lewis was lawfully detained, its results should not be suppressed. However, the Court concludes that Defendant Lewis' April 15, 2013 statements to Detective Honea should be suppressed as fruit of the poisonous tree from the illegal arrest. Defendant Lewis and the Government stipulated that Defendant Lewis was read his *Miranda* rights after the show-up. The Court was presented with no evidence of an intervening event to remove the taint of the illegal arrest. Accordingly, the Court will recommend that the April 15, 2013 statements be suppressed.

Based on the foregoing and good cause appearing therefore,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Derrick Young's ("Young") Motion to Suppress (#25) be **denied**.

24

**IT IS FURTHER RECOMMENDED** that Defendant Thomas Lewis' ("Lewis") Motion to Suppress (#26) be **denied in part and granted in part as discussed above**.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 17th day of January, 2014

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

25